C. A. MUNROE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 76999.   Promulgated April 5, 1939.

*J. G. Korner, Jr., Esq., Frank J. Wideman, Esq.,* and *Richard S. Doyle, Esq.,* for the petitioner.

*J. E. Marshall, Esq.,* and *L. C. Mitchell, Esq.,* for the respondent.

OPINION.

KERN: The Commissioner has determined a deficiency in the petitioner's income tax for the year 1930 of $2,950,592.22, which result from the respondent's inclusion in the petitioner's gross income of $11,947,331.44, said to have been realized on the distribution to the petitioner in that year of two-thirds of the stock of the Corporate Investment Co. of Delaware and of one-third of its stock to the Inverness Corporation, Ltd., of which the petitioner was the sole shareholder. The total sum represents earned surplus of the Corporate Investment Co. of Illinois on October 6, 1930, $8,454,159.34, plus the liability of that company to the petitioner on certain contracts on the same day, $3,493,172.10; both of which were converted into stock of Investment of Delaware by certain intercompany transactions. The value of the stock of the several corporations on the dates of the corporate exchanges and the value of the contracts on the critical dates have been stipulated and are not in question here.

The principal question is whether the corporate exchanges in 1930 constituted a "reorganization" within the ambit of section 112 (i) of the Revenue Act of 1928, set out in the margin,[1] and were thus tax-free. The Commissioner raises two additional questions, whether there was a liquidation of the Corporate Investment of Illinois in 1930, and whether in that year the petitioner realized gain on cancellation of the two contracts executed by petitioner and that company whereby Investment of Illinois was obligated to make certain payments to petitioner in 1932.

We have set out the facts fully in our findings and resume them here only for the sake of clarity in discussion of the legal questions.

In 1922 the petitioner organized Corporate Investment Co. of Illinois to buy installment paper. For $6,000 he became sole beneficial owner of its stock. He furnished additional capital to it under a contract of September 13, 1922, and its supplement of March 5, 1923, whereby he transferred to the corporation certain securities which were to be returned to him ten years later together with interest or dividends received thereon plus one-fifth of such interest or

---

[1](i) *Definition of reorganization.*—As used in this section and sections 113 and 115—

(1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected.

(2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

dividends. After 1924 Investment of Illinois was used only as an investment company. In 1927 it earned a profit of around $8,000,000.

Petitioner's counsel as early as 1924 had suggested the reorganization of Investment of Illinois in another state in order to effect a recapitalization of that company under the laws of a state having a more favorable tax policy than Illinois, but it was not until the fall of 1929 that three new corporations, the Manistee Corporation, Camrow Corporation and Inverness Corporation, were organized in Delaware. The petitioner had removed to New York and his business there, complicated by the depression of 1929, occupied his mind to the exclusion of other affairs until 1930, when he was visiting the Bahamas and conceived the idea of organizing a corporation there which would engage in the business of buying and selling foreign securities with a minimum tax burden. He advised with counsel, who again suggested the reorganization of Investment of Illinois in connection with the formation of the Bahamian Corporation, and as a result a new plan was devised, new corporations were created, and the corporate exchanges in question took place.

The first step was to revive the dormant Delaware Corporation, Manistee, which was begun by changing its name on September 18, 1930, to Corporate Investment Co. of Delaware. Next came the creation of two corporations in the Bahamas, on September 25, the Inverness Corporation, Ltd., and Camrow Corporation, Ltd. The several exchanges followed. (1) On October 6, the petitioner transferred property, including his beneficial interest in the contracts of 1922 and 1923 with Investment of Illinois, to Inverness in exchange for all its stock. (2) On the next day, October 7, Investment of Illinois transferred all its assets subject to its liabilities to Camrow for 1,000 shares of the latter's stock, and distributed Camrow's stock to its own sole shareholder, the petitioner. Its liabilities included its obligations to petitioner under the two contracts. (3) On the same day, October 7, Inverness, holder of the petitioner's beneficial interest in the two contracts since two days before, canceled the contracts in exchange for 500 shares of Camrow's stock, thus vesting the full accrued proceeds of the contracts in Camrow free of any liabilities. The petitioner upon the completion of these acts owned immediately 1,000 shares or two-thirds of the total capital stock of Camrow, and mediately, as sole shareholder of Inverness, the beneficial interest in the remaining one-third of Camrow's stock, 500 shares. (4) An interval of a week was allowed to elapse before the final act which consummated the transaction. On October 14 Camrow transferred its assets, subject to its liabilities to Corporate Investment Co. of Delaware (the old revived Manistee Corporation of 1929) in exchange for all the latter's stock, 10,000 shares, which was at once distributed,

6,667 shares to the petitioner and 3,333 to Inverness, in the same proportion as that in which the petitioner and Inverness held Camrow's stock. Camrow thereafter was only an empty shell, having no assets, but its formal dissolution was postponed until February 9, 1931. The ultimate result was that the petitioner, from being sole shareholder of Investment of Illinois, was now a shareholder of two-thirds of the stock of Investment of Delaware and controlled, as sole shareholder of Inverness, the remaining one-third of that company's stock. The assets of Investment of Delaware were the same as the assets of Investment of Illinois but freed of any liabilities to petitioner on his contracts with the latter.

On this state of facts, the Commissioner earnestly contends that the case falls within the rule of *Gregory* v. *Helvering*, 293 U. S. 465. The *rule* of that case is that where a transfer of assets is made by one corporation to another not "in pursuance of a plan of reorganization" but in pursuance of a plan having no relation to the business of either, the purpose of which is not to reorganize a business or part of a business but being solely to consummate a plan to transfer property to a taxpayer in such a way as to decrease or avoid taxes, then such a transaction will not be considered as a "reorganization" within the meaning of section 112 (i) of the Revenue Act of 1928. To state the rule conversely: Where such a transfer of assets is made in pursuance of a plan of reorganization which has a definite relation to the business of both corporations, the primary purpose being to reorganize a business and not solely to effect a transfer of property to a taxpayer in such a way as to decrease or avoid taxes, the transaction will be considered as a "reorganization" within the meaning of the act, even though one of the purposes and results of the transaction is to minimize taxes. The *holding* of that case was that under the facts presented there had not been a reorganization within the meaning of the act.

However, the facts of that case are clearly different from those here. There the new corporation, Averill, was brought into existence solely for the purpose of acquiring the Monitor shares and distributing them to the petitioner. It was kept alive only three days, within which this purpose was accomplished. It was not an "enduring" corporation, cf. *Chisholm* v. *Commissioner*, 79 Fed. (2d) 14, but one created solely to evade taxes. Here, on the other hand, petitioner intended to dissolve the Illinois corporation and transfer its assets to a corporation organized in a state having less onerous corporate taxes. Investment of Delaware served that purpose. As the evidence shows, the Delaware Corporation was created before the scheme of the Bahamian corporations was thought of. It was created as the Manistee Corporation of Delaware in the fall of 1929 and, when the

reorganization scheme was worked out and carried into execution in the fall of 1930, its name was changed and it was used, as originally intended, to receive the assets of Investment of Illinois. The fact that certain intermediate corporate exchanges took place does not affect or vitiate the ultimate purpose to transfer to a Delaware corporation assets previously held in an Illinois corporation. Here also, Inverness, the Bahamian corporation called into existence for the purpose, among others, of effecting the transfer of the petitioner's beneficial interest in the contracts through Camrow to Investment of Delaware, remained in existence, holding one-third of Investment of Delaware's stock. It also held other stock and an option transferred to it by petitioner, and not conveyed by it to Camrow. Its existence would have been none the less real if the plan had provided that Inverness be only a holding company. *Chester A. Souther*, 39 B. T. A. 197. Nor is it material that Camrow was only a conduit for assets going to Investment of Delaware, for in doing so, it served a business purpose vital to the reorganization and inherent in the plan; and it is not necessary that the "business purpose" of every corporation shall be strictly commercial. *Chester A. Souther, supra.* The assets of Investment of Illinois, including the proceeds of the contracts, ultimately were transferred to Investment of Delaware, freed of the contract burden, and petitioner after the transfer held the stock of Investment of Delaware, which partially represented the chose in action under the contracts it had previously held against Investment of Illinois. A reorganization of Investment of Illinois had taken place, but petitioner's interests still remained in solution. Nothing was cut off and distributed to him which could be said to be a realized gain, the withdrawal for his separate use of any asset formerly in the original company. He had stock in Investment of Delaware representing the same assets as those held by Investment of Illinois.

We think that the series of transactions should be viewed as a whole, embodying merely steps in the execution of a single plan. That this was intended is obvious, and although no written plan was put in evidence, it is obvious that there was a plan of reorganization and what that plan was. One of its purposes was to defer realization of income on the contracts, with two years still to run at the time of the plan's execution, until some future date. However, there were other purposes of the plan. Looking at the transactions as a whole, as steps in a single plan, we must conclude that the ultimate purpose was the reorganization of Investment of Illinois and the transfer of its assets to a Delaware corporation and a Bahamian corporation, with the assets freed of the contractual obligation to Munroe.

We are of the opinion that the new corporations, Inverness and Investment of Delaware, were real and organized for a legitimate business purpose, and that the principle of *Gregory* v. *Helvering*, *supra*, therefore, has no application. What was sought to be accomplished by the plan was carried out as a reorganization within the intent of section 112(i).

We have set out fully in our findings the fact of Inverness's dividends from which respondent infers that that corporation did not have a profitable business and hence was a mere sham device which would enable the petitioner as sole shareholder to "siphon off" at will its accumulated gains. A like argument on similar grounds is made in respect to Investment of Delaware. It is not disputed that both Inverness and Delaware were going and operating companies since 1930. The fact that during some years subsequent to 1930 these companies did not have a profitable business and the fact that one of them paid dividends out of earnings in spite of the presence of a corporate deficit are not so unusual as to cause an inference that these corporations were shams. It has never been suggested that reorganizations must be profitable in order to be considered as reorganizations within the meaning of the revenue act.

We turn now to respondent's argument that there was a liquidation of Investment of Illinois, which rests, apparently, upon the theory that petitioner contributed the assets in 1922 to Investment, not under contract to return them or their proceeds within ten years, but as a capital contribution; and that Investment transferred in 1930 all its assets to Camrow in exchange for all of Camrow's stock and then distributed the stock to its sole shareholder, the petitioner, without the surrender by petitioner of any of his shares in Investment. We find this argument irrelevant in the light of our conclusion that the Investment-Camrow exchange was part of a reorganization. Such it was under section 112 (g), and it is immaterial whether or not Investment of Illinois was liquidated in the course of this general transformation. *George Whittell & Co.*, 34 B. T. A. 1070; *Helvering* v. *Schoellkopf*, 100 Fed. (2d) 415, affirming 35 B. T. A. 855.

Nor do we find more in point respondent's final contention that the cancellation of the contracts resulted in taxable income of $3,493,172.10 to the petitioner. This appears to be alternative and contradictory to the second contention, just noticed, since it assumes the validity of the contracts. The beneficial interest in the contracts was a chose in action, "property", which petitioner might transfer to Inverness solely for stock without recognition of gain or loss, under section 112 (b) (5), as we have already pointed out. Inverness in turn transferred this asset to Camrow for stock, which, as we have

said, might properly be done. We are unable to find any similarity between this situation and that in *Groves* v. *Commissioner*, 99 Fed. (2d) 179, affirming 36 B. T. A. 14, to which respondent likens it. There personal service contracts were involved; here the contracts were for the earnings from property, from the securities which petitioner had transferred to Investment of Illinois. The distinction is elemental in tax law. As we have already said, the transfer of Inverness's chose in action to Camrow in exchange for stock, an act which freed the contract proceeds in Camrow's hands from liabilities, resulted in no income to Camrow, for Camrow parted with its capital stock to obtain its release; and, obviously, to no income to Inverness, which acquired Camrow's stock in exchange for the property represented by its contract; nor to petitioner, whose interest in the contracts still remained in solution through the substitution therefor of Camrow's stock and of Inverness's stock. We are unable here again to find any income realized by petitioner through the "cancellation" of the contracts.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*